# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs September 18, 2013

## STATE OF TENNESSEE v. BRIAN ALAN LAMBRIGHT

**Appeal from the Criminal Court for Davidson County**
**No. 2010-A-525     Cheryl Blackburn, Judge**

---

**No. M2012-02538-CCA-R3-CD - Filed January 7, 2014**

---

The defendant, Brian Alan Lambright, was convicted by a Davidson County Criminal Court jury of four counts of aggravated child abuse, Class A felonies, which the trial court merged into two convictions and sentenced the defendant to twenty-two years on each conviction, to be served consecutively, for an effective term of forty-four years in the Department of Correction. On appeal, the defendant challenges the sufficiency of the convicting evidence and the sentences imposed by the trial court. After review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the Court, in which JOSEPH M. TIPTON, P.J., and JEFFREY S. BIVINS, J., joined.

Joshua L. Brand (at trial and on appeal) and Rachel C. Welty (at trial), Nashville, Tennessee, for the appellant, Brian Alan Lambright.

Robert E. Cooper, Jr., Attorney General and Reporter; Tracy L. Bradshaw, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Brian K. Holmgren and Mindy J. Morris, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

## FACTS

On May 29, 2009, the victim's mother was living at the Congress Inn with her two children: her nine-day-old son, the victim, and her almost two-year-old daughter. The victim's mother left the motel during the afternoon, leaving her children in the seventeen-

year-old defendant's care. When she returned to the room, the victim was lying on the floor, covered in blood, with several wounds on his face and hands. The victim was ultimately taken to Vanderbilt Children's Hospital, where he was examined and treated for his injuries. The examination showed that the victim had sustained multiple bite injuries to his face and one finger was partially amputated.

### State's Proof at Trial

Officer Michael Buchanan with the Metropolitan Nashville Police Department testified that he responded to Vanderbilt Children's Hospital on May 29, 2009, concerning a possible case of child abuse. He met with the victim's mother, who told him that she was in the kitchen and when she came back into the room, the victim's sister was standing over the victim saying, "baby, baby." Officer Buchanan noted that the victim's mother's demeanor alarmed him "because she kind of acted like she wanted to stop talking to the police as soon as possible," and she was not crying and did not appear to be upset. Officer Buchanan said that he later saw pictures of the injuries to the victim and noted that he would have immediately notified Youth Services Division had he seen those injuries that day.

The victim's mother testified that her friend, Christina Goodrich,[1] was staying with her and her children at the Congress Inn at the time of the incident. Around 3:00 p.m. on the day of the incident, she and Christina left the motel to sell furniture at a trailer park across the street. She left her children with Christina's nephew, the defendant, who had also been staying with them at the motel since the previous day. The victim's mother noted that the defendant had helped with the victim's feedings and diaper changes since his arrival at the motel. She asked the defendant to watch her children while she was away, and the defendant agreed. When she left, the victim was asleep, swaddled in a blanket on the bed. The victim's sister was also asleep, but the defendant was not.

The victim's mother testified that she was away from the motel for two or three hours. She called the defendant on his cell phone once while she was gone, and he told her that her children were all right. However, she later tried to reach the defendant again a couple of times, and he did not answer her calls. When she returned to the motel, she first looked through the window into her room and observed the victim lying on the floor at the foot of the bed, appearing to be in shock. She pounded on the door, and the defendant opened it within "seconds." She went inside and immediately checked on the victim to ensure that he was still breathing. The victim was not crying, and his eyes "were kind of in between open and shut." The victim was no longer swaddled and had blood on his forehead, lip, chin,

---

[1] Because some of the individuals involved in this case share the same surname, we will refer to them by first name only for clarity. We mean no disrespect by this practice.

finger, and clothing. The victim's sister was "hysterical," screaming into the phone, "mama, baby, mama, baby[.]" She was shirtless and had dried blood on her chest. She asked the victim's sister if she bit her brother, and she shook her head no. The victim's mother recalled that the defendant, who appeared to be worried or stressed, backed into a corner of the room and said, "I'm so sorry, I'm sorry, I'm sorry." He ran out the door less than five minutes later, to his father's house across the street.

The victim's mother testified that, at the time of the incident, the victim's sister had about four top and four bottom teeth. The victim's sister was slightly jealous of the victim and had tried to crawl on the victim's mother while she was holding the victim. However, the victim's mother never witnessed the victim's sister make any aggressive behaviors toward the victim. The victim's sister bit Christina Goodrich's son, who was the same age as the victim's sister, a week or two before the incident, but she had never witnessed the victim's sister biting any other children. The victim's mother punished the victim's sister by biting the tip of her finger "[o]n the nail" to show her that biting is hurtful.

The victim's mother cleaned up the victim in order to assess his injuries and then called Christina Goodrich to take her to the hospital. The victim's mother knew the victim needed to go to the hospital but was scared that the hospital would take her children from her custody. Christina arrived within twenty minutes of when the victim's mother got back to the motel. She had a friend, Danny Ray Grantham, as well as the defendant, with her. Grantham drove the victim's mother, the victim, Christina, and the defendant to Skyline Medical Center, while the victim's sister stayed with Linda Poteete, the defendant's stepsister. During the drive to the hospital, the defendant continued to state that he was sorry, and the victim's mother told him to "shut up."

The victim's mother admitted that she told the medical staff that she had been in the kitchen preparing a bottle, when the victim's sister picked up the victim, dropped him, and bit him. She said that she gave them this false story because she was scared the hospital would take the victim from her custody and send her to jail. After spending approximately an hour at Skyline Medical Center, an ambulance transported the victim's mother and the victim to Vanderbilt Children's Hospital. The victim's mother also told the medical staff at Vanderbilt the same false story about the victim's injuries – that she walked into the room and saw the victim's sister standing over the victim. Vanderbilt medical staff ran tests on the victim, took photographs of his injuries, and stitched his finger and lip injuries. Prior to discharge from the hospital, the victim's mother told a caseworker the true history of events – that she was away from the motel while the defendant watched her children. Her mother had prompted her to tell the truth.

Michael Smith, Christina Goodrich's uncle, testified that he had a yard sale at the

Rainbow Trailer Park on May 29, 2009, and that Christina and the victim's mother sold a couch and chair at the yard sale and used his truck to deliver them. At some point after returning from delivering the items, Christina received a phone call that she was needed at the motel.

Christina Goodrich testified that the defendant was her nephew by marriage. Christina said that, after the victim's mother gave birth to the victim, she stayed with the victim's mother at the Congress Inn to help the victim's mother with her children. The defendant also stayed with them the night before the incident and assisted in helping care for the children. On the afternoon of May 29, 2009, Christina and the victim's mother left the motel to sell furniture at the Rainbow Trailer Park across the street from the motel. They left the defendant in the room to watch the victim's sister and the victim, who was sleeping and had no injuries. They were gone for approximately two hours, and then the victim's mother returned to the motel. Shortly thereafter, Christina received a phone call from the victim's mother, who was "[f]rantic," and Christina "shot off running" to the motel.

Christina testified that, when she arrived at the room, she saw that the victim had "a gash above each of his eyebrows," bite marks and blood on his body, a cut lip, and a cut pinky finger. The defendant was not in the room, and the victim's sister was wearing only her diaper and had dried blood on her chin and chest. Christina could tell that the victim needed medical attention. She ran across the street to the trailer park to find someone to take them to the hospital, as well as someone to watch the victim's sister. She saw the defendant sitting outside the trailer park, hunched over, with his face leaning in toward his knees. She told him, "[L]et's go, you got to go, too, you were there, you know, you're responsible." Christina then went back to the motel and met friends, who assisted in transporting them to the hospital.

Christina acknowledged that, when she found the defendant, she did not notice any blood around his face or on his clothing. She also acknowledged that, when she saw the victim's sister, she had blood on her face and chin. She admitted that the victim's sister bit one of her sons about a week before the incident and that the bite drew blood. However, the bite her son received did not look anything like the bites on the victim.

Dr. Thomas Abramo, an expert in emergency pediatric medicine and child abuse, testified via a video deposition. Dr. Abramo testified that he examined the victim at Vanderbilt on May 29, 2009, at 11:28 p.m. He received a history from the victim's mother, who stated that she entered the room to discover her two-year-old child holding the victim, but the two-year-old got scared and dropped the victim and that was when the mother "noticed all of the lesions and the bruising and the bleeding." Dr. Abramo did not think the mother's story "fit historically with the type of injuries and the patterns that [he] saw for th[e]

[victim] in relationship to the description of the two year old doing it."

Dr. Abramo's examination of the victim revealed multiple lacerations on his forehead and fingers and bruise marks or trauma to his face, chin, abdomen, and extremities. He believed to a reasonable degree of medical certainty that the bruises on the victim's abdomen and legs were bite marks and that the injuries appeared to have been inflicted within less than twenty-four hours of his examination. He described the victim's finger laceration as "very significant" in that it was "partly amputated" and "just barely hanging on." He believed that the victim would have reacted in "very high-pitched," "[b]lood-curdling cries and screaming" when he sustained the injuries because he would have been in significant pain.

Dr. Abramo said that the victim's injuries "just didn't seem to fit the pattern for a two year old to do this type of injury." He explained that a two-year-old did not have the dexterity to produce the severity and number of injuries that the victim sustained. In his thirty years of experience and having treated between 300,000 and 400,000 children, he had never witnessed a case involving a two-year-old causing such a degree of injury from biting. He explained that, after biting a baby, a two-year-old would usually "get startled and drop the baby and run or hide."

Julie Hooper Ripski, a social worker at Vanderbilt Children's Hospital, testified that she responded to a call concerning the victim. She met with the medical team, reviewed the victim's injuries in person and in photographs, and interviewed the victim's mother about what had happened. The victim's mother informed Ripski that she was in the kitchen preparing a baby bottle, while the victim was in a stroller and the victim's sister was asleep in bed. She heard the victim crying and went into the room and discovered that he was injured and bleeding.

Ripski testified that the victim's mother's demeanor concerning the victim's injuries was "pretty blase," which concerned Ripski. She noted that the victim's mother spoke about the victim's injuries "as if it wasn't as big a deal as what [Ripski] was looking at." Ripski was very skeptical of the victim's mother's story because she wondered how a two-year-old could have inflicted the injuries without the victim's mother hearing or noticing what was happening. She thought that "[l]ots of things didn't add up about the story and the situation." Ripski did not speak to the defendant concerning his involvement because she did not "even know of his existence" during her involvement with the case.

Deanna Reese, a social worker at Vanderbilt Children's Hospital, testified that she spoke with the victim's mother the Monday morning following the incident, and the victim's mother admitted that she had not been honest with the previous social worker. The victim's mother told her that she was not present when the victim got injured and that the defendant

had been caring for her children while she sold furniture. Reese said that she was bothered by the story the victim's mother had told Ripski because Reese had never seen "those injuries caused by a small child."

Dr. Kris Rehm, an expert in the filed of pediatrics and child abuse and a pediatric hospitalist at Vanderbilt School of Medicine, testified that she was a member of Vanderbilt's Child Abuse Recognition and Evaluation ("CARE") team and evaluated the victim on June 1, 2009. Dr. Rehm said that she reviewed photographs of the victim's injuries and was concerned "about the pattern of injuries . . . and the pattern of bruising, the number of bite mark bruising type things, and the injury to the finger." She was suspicious as to how those injuries could have occurred. It did not make sense to her that a two-year-old could have caused the victim's injuries.

Dr. Rehm testified that, in her opinion, the circular lacerations above the victim's eyes and on his nose, chin, cheek, jaw line, knee, and abdomen were bite marks. She determined that the victim sustained a total of eight or nine bite injuries. She described the laceration to the victim's pinky finger as almost a partial amputation. She explained that, had a bite caused the laceration, then she would likely see an indication on the backside of the finger. She reviewed photographs and observed that the backside of the finger did not have any indication of a bite mark or bruising. Therefore, Dr. Rehm believed, to a reasonable degree of medical certainty, that a bite did not cause the laceration, rather a different kind of instrument, such as a knife, was the cause.

Dr. Rehm testified that the victim's injuries "were certainly non accidental trauma," meaning the result of child abuse. She opined that a two-year-old would not have the forethought and foresight to have caused the degree, number, and symmetrical pattern of injuries the victim sustained. She said that two-year-old children certainly bite, but they typically only bite once because they "step back and are startled" when the victim cries out in pain. She opined that the victim would have been in "[s]evere excruciating pain" when he sustained the injuries and immediately would have been crying very loudly. Dr. Rehm said that, if a toddler did bite more than once, the marks would disappear in a couple of days and would not cause any disability or require hospitalization. She had never seen the extent of injury from a toddler caught biting as was seen on the victim. She also described the symmetrical pattern of the victim's injuries, which further led her to believe that a two-year-old did not inflict the injuries because it looked like "there was a plan of . . . the next step in where to go."

Dr. Rehm testified that there was a recommendation that a psychiatric evaluation be conducted on the victim's sister because of the initial history provided by the victim's mother, but to her knowledge it was never done. She explained that it was likely one was not

performed because, "as [they] got more information, [they] recognized that that would be unnecessary." On cross-examination, Dr. Rehm acknowledged that she was not a forensic odontologist. She said that the number of teeth different children have at a certain age varies but that it is very normal for a two-year-old to have four teeth on top and four teeth on bottom.

Detective Selene Julia with the Metropolitan Nashville Police Department Youth Services Division testified that she was assigned the victim's case on June 1, 2009, and interviewed the victim's mother for the first time the following day. During that interview, Detective Julia learned that the defendant had been taking care of the victim when the injuries occurred. Detective Julia also took photographs of the victim's injuries that day, which she ultimately provided to a forensic odontologist, Dr. Michael Tabor. On June 3, Detective Julia transported the victim, the victim's mother, and the victim's sister to meet with Dr. Tabor to examine the victim's injuries. Detective Julia noted during her interaction with the victim's sister that the victim's sister had four upper teeth and four lower teeth. She observed that the victim's sister acted "loving" toward the victim, giving him kisses, showed no signs of aggressive behavior, and behaved like "an appropriate older sibling."

Detective Julia testified that she also interviewed the defendant at his residence on June 9. The defendant told Detective Julia that the victim's mother and Christina left the motel room at 4:30 p.m. and that the children were asleep and without injuries. The victim's mother locked the motel room door, and the defendant never let anyone inside the room after they left. He estimated that the victim's mother and Christina were gone thirty-five to forty-five minutes. The defendant said that he created a "fortress" of pillows around the victim, who was asleep on a bed, and removed the victim's shirt because it was hot, leaving the victim in only a diaper and shorts. The defendant claimed that, sometime after the victim's mother and Christina left, he also fell asleep but later admitted that he received a text message from Christina checking on the children, to which he responded that the children were all right and asleep. The defendant stated that, after he fell asleep, he was awakened by the sound of the victim's mother knocking loudly on the window and door. He saw that the children were awake, with the victim on the floor and the victim's sister holding the phone and screaming. The defendant told Detective Julia that he was a very heavy sleeper. He never mentioned that he heard the victim crying or screaming, or that any other individuals had come into the motel room.

The defendant was questioned about the injuries he observed on the victim after he woke up, and he offered no explanation for the victim's injuries. The defendant never suggested that the victim's sister caused the injuries. The defendant admitted that he carried a pocketknife but said that he did not think he had it on him on the day of the incident. He told Detective Julia that they were "not going to get any trace of blood off of it." Detective

Julia testified that testing of the knife did not return any results that established a connection between the knife and the victim's finger. Detective Julia later obtained cell phone records for the defendant's phone, which indicated that calls were made with the defendant's phone at 5:05 p.m. and 6:30 p.m. on the date in question.

Dr. Michael Phillip Tabor, a dentist and expert in forensic odontology, testified that he examined the victim on June 3, 2009. He was also provided photographs of the victim's injuries that were taken in the hospital. Dr. Tabor identified a number of bite marks on the victim's face, including four or five on the left side of his face, three on his right cheek, multiple bites over his eyes, a bite mark over his nose that included his upper lip and caused a puncture wound, a bite mark completely around his mouth, and a bite mark over his knee. The bite mark over the victim's nose that included the upper lip showed that the attacker's lower teeth bit the victim's upper lip, causing a "punch mark." He determined that the "punch mark" came from the attacker's lower right cuspid tooth – a pointed tooth that leaves a triangular-shaped bite mark.

Dr. Tabor testified that it would be appropriate for a two-year-old to have four upper and four lower teeth, and such child would not have any cuspid teeth. A child would have to have six or more teeth present and erupted on his or her lower mouth in order to have a cuspid tooth that could inflict the punch mark found on the victim's upper lip. Dr. Tabor said that, considering the number of teeth that the victim's sister had, she would not have been capable of producing the bite mark found on the victim's nose and upper lip. It was Dr. Tabor's expert medical opinion that a two-year-old was not capable of producing the nature, severity, number, and orientation of bites sustained by the victim. He said that in his twenty years of experience in examining approximately ten bite mark cases a year, he had never seen a case that involved the type or severity of injuries that the victim had suffered. Furthermore, he was not aware of any evidence in the scientific literature that would support the hypothesis that a two-year-old child could produce the nature, number, and severity of injuries the victim sustained. In Dr. Tabor's opinion, to a reasonable degree of medical certainty, an adult inflicted the victim's injuries.

Dr. Tabor examined the injury to the victim's finger and did not see any evidence of teeth impressions on the backside of the finger. He said that there was not enough information in the photograph to tell whether the injury was consistent with a bite mark impression but said that it looked "like a straight line incision," which was inconsistent with a bite mark.

On cross-examination, Dr. Tabor stated that he could not specifically identify a perpetrator because the bite mark evidence in the photographs was of "low evidentiary value. In other words, they're poor quality. They're fuzzy." Asked whether the puncture mark

wound on the victim's upper lip could have been caused by the angle and movement of a non-cuspid tooth pulling away, Dr. Tabor stated that it was possible but "really coincidental for the tear to be exactly in the shape of a triangle, which is exactly the shape that all cuspids make when they bite." On redirect examination, Dr. Tabor stated that some of the injuries could have been pediatric bite marks, but he could not tell because of their low evidentiary value. However, he did not believe that a child produced the victim's injuries.

### Defendant's Proof at Trial

Danny Ray Grantham, the defendant's second cousin, testified that he took the defendant's brother, William Goodrich, to the motel room on the date of the incident. They knocked on the door, but no one answered. The victim's mother came out of another motel room and also knocked on the door. "Not very long" thereafter, the defendant opened the door. Grantham and the victim's mother entered the room at the same time, and he saw the victim lying on the floor. He and the victim's mother both went directly to the victim, and the victim's mother picked up the victim and started rocking him. Grantham saw the victim's sister standing between the beds.

Grantham testified that he did not remember saying much to the defendant because his focus was on the victim. However, he recalled that the defendant acted like "[h]e was still waking up" because he was rubbing his eyes and "had bed head." Grantham did not see any blood on the defendant's face or body. However, he saw a splatter of blood on the wall, not far from the victim.

Grantham urged the victim's mother to take the victim to the hospital but, because she was acting like she was possibly not going to take him, Grantham grabbed the victim and got into his van. He said that he, his father, William Goodrich, Christina Goodrich, and the victim's mother all got into the van and transported the victim to Skyline Medical Center. Grantham believed that the defendant also went to the hospital with them. Grantham explained that the victim's mother was reluctant to go to the hospital because she was afraid she would be tested for drugs and possibly have her children taken away from her.

Linda Poteete testified that Christina Goodrich contacted her the afternoon of May 29, 2009, and asked her to come to the motel. When Poteete arrived, she saw the defendant sitting on a bed. She did not remember seeing any blood on him. The victim's mother was holding the victim, but Grantham "grabbed the baby and jumped into the van because the victim's mother didn't want to go to the hospital." Christina asked Poteete to watch the victim's sister while the others took the victim to the hospital. She took the victim's sister back to her trailer home across the street from the motel.

Poteete described the victim's sister as "just a little toddler" who "just started walking." She said that she cleaned blood off the victim's sister's shirt, around her mouth, and between her fingers. Poteete admitted that the victim's sister could have gotten blood on her on the places Poteete observed had she tried to pick up the victim to hold and comfort him. Poteete admitted that she told an investigator for the defense, definitively, that the victim's sister had four top teeth and three bottom teeth.

Faith Blocker testified that she was at a neighborhood cookout in the summer of 2009, shortly after the victim's mother had given birth to the victim, and the victim's sister bit Blocker's sleeping daughter on the leg. The bite drew blood. Blocker confronted the victim's mother about the incident, and the victim's mother said, "[S]he does it all the time" and did not reprimand or punish the victim's sister.

The defendant testified that, in 2009, he was seventeen years old, in the tenth grade, and lived with his father in the Rainbow Trailer Park. On the day of the incident, his aunt, Christina Goodrich, and the victim's mother left the motel to sell furniture, and he fell asleep, being tired from having helped watch the children the night before. He was not directly asked to watch the children and did not tell the victim's mother that he would.

The defendant testified that the next thing he knew, he "was awoken by some banging on the door and window." He got up and opened the door, and that was when he saw the victim on the floor. The defendant recalled that the victim's mother entered the room, picked up the victim, and started yelling at him. He saw that the victim had a cut above his eye and bite marks on his face. The defendant described that he "was a wreck" when he saw the victim and did not know how it happened. He "was shocked" and "didn't really say nothing back to [the victim's mother]."

The defendant testified that, not knowing what to do next, he sat back down on the bed. He recalled that the victim's sister was standing between the two beds, "hollering on the phone." He did not remember seeing any blood in the room because he "was just waking up" from sleeping. Several people arrived at the motel room, including Grantham and his father, Clarence Grantham, William Goodrich, and Christina Goodrich. Grantham and the victim's mother argued about taking the victim to the hospital, but after about five minutes, everyone got into the van and drove to the hospital.

The defendant did not remember receiving or placing any calls at 5:05 p.m. or 6:30 p.m. He said that he sometimes allowed Christina Goodrich to borrow his cell phone; however, he admitted responding to a text message from Christina checking on the children before he fell asleep. The defendant denied causing the victim's injuries or knowing how the injuries occurred, maintaining that he was asleep when it happened. He said that the

victim's sister was the only other person who could have caused the victim's injuries, as he did not let anyone in the room after the victim's mother and Christina left. He stated that he was an extremely heavy sleeper and was completely oblivious if the victim was screaming when he received his injuries. However, he admitted that he did not sleep through the victim's mother's knocking on the door.

The defendant claimed that Grantham's testimony that he and the victim's mother walked into the motel room at the exact same time was false. The defendant denied leaving the room right after the victim's mother came in and confronted him, explaining that he did not leave the room until Grantham and the others arrived. The defendant said that when the victim's mother asked him what happened, he said, "I'm sorry, I do not know." He denied repeatedly telling her, "I'm sorry, I'm sorry."

After the conclusion of the proof, the jury convicted the defendant of four counts of aggravated child abuse.

**Sentencing Hearing**

The trial court conducted a sentencing hearing on September 5, 2012. At the hearing, Detective Kevin Cooley with the Metropolitan Nashville Police Department testified that previously worked in the Youth Services Division, and, in 2002-2003, he investigated two sets of allegations against the defendant, who was twelve years old at the time, and his brother, William Goodrich. The allegations charged that the defendant and William (1) touched or attempted to touch an elderly woman and (2) engaged in forcible rape that involved penile anal contact upon a four-year-old victim. The defendant claimed that the elderly victim had "enticed them or coerced them to come over and fondle her," but Detective Cooley's investigation did not support such claim. The defendant admitted that he participated in the penile anal penetration of the victim. Detective Cooley recalled that a juvenile court petition was filed, but he did not recall the outcome. However, evidence was presented that the court granted the defendant an acquittal on "the two counts of rape of a child."

Christina Goodrich testified that she discovered photographs of her nude daughter and of her daughter's genitals on the defendant's cell phone. Christina also recalled that, in 2002, she was interviewed about the allegations against the defendant involving an "elderly" woman. She said that the woman, who she thought was in her late fifties or early sixties, was living at her parents' house at the time. Christina stated that she overheard William tell the defendant to lift up the woman's dress while she was sleeping. Christina then caught the defendant standing "dead in his tracks" beside the woman's bed. She did not think the defendant engaged in any type of sexual activity with the woman.

-11-

Wendy Goodrich, the defendant's mother, testified for the defense. Wendy stated that, during his youth, the defendant was diagnosed with Attention Deficit Disorder, Oppositional Defiant Disorder, and a sleeping disorder, for which he received mental health treatment. The defendant attended special education classes in school because of his Attention Deficit Disorder and a learning disability. The defendant told her that he was sexually touched by a friend in 2003 or 2004.

The trial court merged the defendant's four counts of aggravated child abuse into two convictions and sentenced the defendant to twenty-two years on each count, to be served consecutively, for an effective term of forty-four years.

## ANALYSIS

### I. Sufficiency of the Evidence

The defendant challenges the sufficiency of the evidence convicting him of aggravated child abuse. He does not dispute that the elements of the offense were satisfied, only his identity as the perpetrator.

In considering this issue, we apply the rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). The same standard applies whether the finding of guilt is predicated upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990).

A criminal offense may be established entirely by circumstantial evidence. State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010). It is for the jury to determine the weight to be given the circumstantial evidence and the extent to which the circumstances are consistent with the guilt of the defendant and inconsistent with his innocence. State v. James, 315 S.W.3d 440, 456 (Tenn. 2010). In addition, the State does not have the duty to exclude every other reasonable hypothesis except that of the defendant's guilt in order to obtain a conviction based solely on circumstantial evidence. See State v. Dorantes, 331 S.W.3d 370, 380-81 (Tenn. 2011) (adopting the federal standard of review for cases in which the evidence is entirely circumstantial).

All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

In light most favorable to the State, the evidence is sufficient to support the jury's finding that the defendant was the perpetrator of the offenses. The evidence shows that only the defendant and the victim's two-year-old sister were in the motel room at the time the victim was injured. The victim's mother testified that, when she returned to the motel room, the defendant, who appeared to be worried or stressed, backed into a corner of the room and said, "I'm so sorry, I'm sorry, I'm sorry." Again, during the drive to the hospital, the defendant continued to state that he was sorry until the victim's mother told him to "shut up."

Multiple experts testified concerning the unlikelihood of the theory that the victim's sister caused the victim's injuries. Dr. Thomas Abramo testified that the victim's injuries "just didn't seem to fit the pattern for a two year old to do this type of injury." He explained that a two-year-old did not have the dexterity to produce the severity and number of injuries that the victim sustained. In his thirty years of experience and having seen between 300,000 and 400,000 children, he had never witnessed a case involving a two-year-old causing such a degree of injury from biting. He explained that, after biting a baby, a two-year-old would usually "get startled and drop the baby and run or hide" due to the resulting "very high-pitched," "[b]lood-curdling cries and screaming."

-13-

Dr. Kris Rehm testified that it did not make sense to her that a two-year-old could have caused the victim's injuries. She opined that a two-year-old would not have the forethought and foresight to have caused the degree, number, and symmetrical pattern of injuries the victim sustained. She said that two-year-old children certainly bite, but they typically only bite once because they "step back and are startled" when the one they bite cries out in pain. She opined that the victim would have been in "[s]evere excruciating pain" when he sustained the injuries and immediately would have begun crying very loudly. Dr. Rehm said that, if a toddler did bite more than once, the marks would disappear in a couple of days and would not cause any disability or require hospitalization. She had never seen the extent of injury from a toddler caught biting as was seen on the victim. She also described the symmetrical pattern of the victim's injuries, which further led her to believe that a two-year-old did not inflict the injuries because it looked like "there was a plan of . . . the next step in where to go."

Dr. Michael Phillip Tabor testified that one of the victim's injuries, a "punch mark" on his upper lip, was caused by the attacker's lower right cuspid tooth – a pointed tooth that leaves a triangular-shaped bite mark. He said that it would be appropriate for a two-year-old to have four upper and four lower teeth, as was reported for the victim's sister, and such child would not have any cuspid teeth. Dr. Tabor said that, considering the number of teeth that the victim's sister had, she would not have been capable of producing the "punch mark" bite. It was Dr. Tabor's expert medical opinion that a two-year-old was not capable of producing the nature, severity, number, and orientation of bites sustained by the victim. He said that in his twenty years of experience in examining approximately ten bite mark cases a year, he had never seen a case that involved the type or severity of injuries that the victim had suffered. Furthermore, he was not aware of any evidence in the scientific literature that would support the hypothesis that a two-year-old child could produce the nature, number, and severity of injuries the victim sustained. In Dr. Tabor's opinion, to a reasonable degree of medical certainty, an adult inflicted the victim's bite mark injuries.

With regard to the victim's finger injury, Dr. Rehm believed, to a reasonable degree of medical certainty, that a bite did not cause the laceration on the victim's finger, rather a different kind of instrument, such as a knife, was the cause. Dr. Tabor testified that he did not see evidence of teeth impressions on the backside of the finger. He said that the injury looked "like a straight line incision," which was inconsistent with a bite mark. The defendant admitted that he regularly carried a pocketknife and told Detective Julia during the course of the interview that they were "not going to get any trace of blood off of it."

Even though the evidence showed that the victim's sister had bitten two other children in the past, she only bit each child a single time, and Christina Goodrich testified that the bite mark on her son looked completely different than the victim's injuries. The

victim's mother testified that she had never witnessed the victim's sister make any aggressive behaviors toward her newborn brother. Detective Julia observed that the victim's sister acted "loving" toward the victim, giving him kisses, showed no signs of aggressive behavior, and behaved like "an appropriate older sibling." Linda Poteete, a defense witness, admitted that the victim's sister could have gotten blood on her on the places Poteete observed had she tried to pick up the victim to hold and comfort him.

Moreover, the jury was within its prerogative in disbelieving the defendant's assertion that he was asleep when the victim sustained his injuries. The defendant claimed that he did not hear the victim screaming in excruciating pain, yet he was able to hear the victim's mother knocking on the door to the motel room, and the defendant's cell phone records show that at least one call was placed on his phone while he was allegedly sleeping.

We conclude that the circumstantial evidence, viewed in the light most favorable to the State, is sufficient for a rational trier of fact to find that the defendant was the perpetrator of the aggravated child abuse of the victim.

## II. Sentencing

The defendant also challenges the sentence imposed by the trial court. He argues that the court failed to consider his potential for rehabilitation or treatment and "gave only cursory attention" to whether the aggregate term of confinement reasonably related to the severity of the offenses. He also claims that his criminal history relied on by the trial court did not consist of violent acts "worthy of such harsh review."

Under the 2005 amendments to the sentencing act, a trial court is to consider the following when determining a defendant's sentence and the appropriate combination of sentencing alternatives:

(1) The evidence, if any, received at the trial and the sentencing hearing;

(2) The presentence report;

(3) The principles of sentencing and arguments as to sentencing alternatives;

(4) The nature and characteristics of the criminal conduct involved;

(5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114;

(6) Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and

(7) Any statement the defendant wishes to make in the defendant's own behalf about sentencing.

Tenn. Code Ann. § 40-35-210(b) (2010).

The trial court is granted broad discretion to impose a sentence anywhere within the applicable range, regardless of the presence or absence of enhancement or mitigating factors, and "sentences should be upheld so long as the statutory purposes and principles, along with any enhancement and mitigating factors, have been properly addressed." State v. Bise, 380 S.W.3d 682, 706 (Tenn. 2012). Accordingly, we review a trial court's sentencing determinations under an abuse of discretion standard, "granting a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." Id. at 707.

In sentencing the defendant, the court first noted the statutory considerations it took into account in reaching the defendant's sentence. In enhancing the defendant's sentence, the court looked at the defendant's past criminal behavior concerning his episodes with an "elderly" woman and his admitted sexual penetration of a four-year-old boy. See Tenn. Code Ann. § 40-35-114(1). The court also enhanced the defendant's sentence because the victim was particularly vulnerable due to his being "brand new to the world . . . [and] totally dependent, helpless," and because the defendant treated the victim with exceptional cruelty in that the bodily injury went beyond what was necessary for the crime. See id. § 40-35-114(4), (5). The court additionally found that the defendant employed a deadly weapon, his teeth, during the commission of the offense. See id. § 40-35-114(9).

In addressing mitigating factors, the court observed that the defendant was a juvenile at the time of the offenses but did not find that he lacked substantial judgment because, although he was young, he was left in charge of the baby and he had been in contact with the police before; thus, "he knew these sorts of things." See id. § 40-35-113(6). The court also found that, although the defendant suffered from a mental or physical condition, it did not significantly reduce his culpability for the offense. See id. § 40-35-113(8). The court observed that it did not "see the connection between [the defendant's] disability and the nature of these offenses for this baby. ADHD does not necessarily lead to biting small babies and doing that sort of thing." The court found that no other mitigating factors were applicable.

We initially note that the trial court was incorrect in its finding that the defendant

-16-

employed a deadly weapon, his teeth, during the commission of the offense because our supreme court has determined that a deadly weapon relates to "an object or instrument other than one's own body." State v. Fleming, 19 S.W.3d 195, 198 (Tenn. 2000). However, the record reflects that the trial court properly considered the purposes and principles of our sentencing act and the remaining applicable enhancement and mitigating factors, which are sufficient to support the twenty-two-year sentences. Accordingly, we affirm the sentences imposed by the trial court.

In addition, the trial court may order multiple sentences to run consecutively if it finds by a preponderance of evidence that one or more of the seven factors listed in the Tennessee Code Annotated section 40-35-115(b) apply, including that the defendant is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high. Id. § 40-35-115(b)(4). When the court bases consecutive sentencing upon its classification of the defendant as a dangerous offender, it must also find that an extended sentence was necessary to protect the public against further criminal conduct by the defendant and that the consecutive sentences reasonably relate to the severity of the offense committed. State v. Lane, 3 S.W.3d 456, 460-61 (Tenn. 1999); State v. Wilkerson, 905 S.W.2d 933, 937-38 (Tenn. 1995).

The court began its analysis of whether the defendant should be considered a dangerous offender by explaining that it also needed to determine whether the aggregate term reasonably related to the severity of the offense and is necessary to protect the public from further serious criminal conduct by the defendant. The court reasoned that the defendant had a history of being involved in "sort of violent behavior" and, in this particular case, the newborn baby left in the defendant's care had multiple bite marks all over his face and a finger almost amputated. The court surmised that there could be no reason for the defendant's actions other than a disregard of life. The court found that, based on the defendant's history, consecutive sentences were necessary to protect the public from further serious criminal conduct by the defendant. The record shows that the trial court took into account the requisite considerations, and its determination is supported by the record.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgments of the trial court.

_____
ALAN E. GLENN, JUDGE

-17-